UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                          Case No. 2:17-cr-1
                                                          HON.  PAUL L. MALONEY

CHRISTOPHER JAMES PETERSON,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Defendant Christopher James Peterson is charged with four counts of falsely labeling fish that were intended to be transported in interstate commerce in violation of the Lacey Act, 16 U.S.C. §§ 3372(d) and 3373(d)(3)(B). (ECF No. 1.) Peterson moves to dismiss the charges on the grounds that the federal prosecution is barred by his treaty fishing rights under the 1842 Treaty with Chippewa, 7 Stat. 591 ("the 1842 Treaty").  (ECF No. 22.)   In response, the Government argues that (1) Peterson's treaty rights do not extend to falsely labeling fish, and (2) Peterson is subject to concurrent federal jurisdiction because the treaty rights are not exclusive. (ECF No. 27.) The Court has referred the motion to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A). Because falsely labeling fish falls outside the scope of Peterson's treaty fishing rights, the undersigned recommends that the Court deny Peterson's motion to dismiss.

Peterson is an enrolled member of The Red Cliff Band of Lake Superior Chippewa ("Red Cliff Band"), which is a federally recognized tribe with its reservation located in Bayfield County, Wisconsin. See Indian Entities Recognized and Eligible to Receive Services From the

Bureau of Indian Affairs, 82 Fed. Reg. 4915-4920 (January 17, 2017). Peterson lives in Hancock, Michigan, where he operates a commercial fishing business on Lake Superior.

As a member of the Red Cliff Band, Peterson's commercial fishing is governed by the Red Cliff Band of Lake Superior Chippewa Tribal Code, Chapter 7 – Commercial Fishing Regulations. In these regulations, the Red Cliff Band has established a quota system for catching lake trout in Lake Superior. The Michigan waters of Lake Superior are separated into eight different parcels identified as MI-1 through MI-8.[1] At the beginning of each year, the Red Cliff Band distributes a limited number of lake trout tags for each parcel. The fisherman must affix these tags to the fish before they are brought to shore. When the fisherman has exhausted the tags designated for one parcel, they are not allowed to fish that parcel until the following year.

In 2012, the United States Fish and Wildlife Service conducted an investigation into the illegal trafficking of fish harvested from the Great Lakes. As part of this investigation, federal agents posed as fish wholesalers on the Keweenaw Peninsula and opened a business called the Upper Peninsula North Fish Company. On several occasions, Peterson met with these agents and agreed to sell to them lake trout. The Government alleges that during these meetings, Peterson informed the agents that he planned to tag the lake trout he caught in MI-2 waters with his MI-5 tags because he needed to manage his MI-2 tags. In the following months, Peterson sold the agents lake trout tagged with MI-4 and MI-5 tags on four different occasions.

Based on these fish sales, the Government filed an information charging Peterson with four counts of violating the False Labeling provision of the Lacey Act. The Lacey Act is one of the nation's oldest wildlife protection laws. Lacey Act, 16 U.S.C. §§ 3371 *et seq.*; S. Rep. 97–

---

[1] The Wisconsin waters of Lake Superior are similarly divided into two parcels. These regulations arose from the Lake Superior Fishing Agreement entered into by the Red Cliff Band and the Wisconsin Department of Natural Resources.

123, at 2 (1981), reprinted in 1981 U.S.C.C.A.N. 1748, 1749.  The false labeling offense makes it "unlawful for any person to make or submit any false record, account, or label for, or any false identification of any fish . . . which has been, or is intended to be . . . transported in interstate or foreign commerce." 16 U.S.C. § 3372(d)(2).  Any person who knowingly violates the false labeling provision could be sentenced to five years imprisonment if the market value exceeds $350.  16 U.S.C. § 3373(d)(3)(A). Here, the market value of the fish Peterson allegedly sold does not exceed $350, therefore, Peterson faces no more than a year in prison and/or a fine. 16 U.S.C. §3373(d)(3)(B).

Courts typically consider two questions when evaluating whether a treaty right precludes a federal criminal prosecution: (1) whether the charged conduct falls within the scope of the treaty rights; and (2) whether congress has abrogated that treaty right. *See United States v. Dion*, 476 U.S. 734, 737-38 (1986)(finding it unnecessary to address whether the defendant's conduct was within the scope of the tribe's treaty rights because the Bald Eagle Protection Act abrogated those rights); *United States v. Brown*, 777 F.3d 1025, 1030-35 (8th Cir. 2015); *see also Soaring Eagle Casino and Resort v. N.L.R.B.*, 791 F.3d 648, 657 (6th Cir. 2015)(addressing the same two questions when determining whether the National Labor Relations Act applied to a tribal casino).  In this case, the Government does not contend that the Lacey Act abrogated the Red Cliff Band's treaty rights. After all, Section 3378(c)(2) of the Act provides that, "[n]othing in this chapter shall be construed as . . . repealing, superseding, or modifying any right, privilege, or immunity . . . reserved, or established pursuant to treaty . . . pertaining to any Indian tribe." Therefore, this case turns on whether the charged conduct falls within the scope of the treaty rights.

To determine whether the charged conduct falls within the scope of a tribe's treaty rights, the Court must construe the relevant Indian treaty. Beginning in the nineteenth century, the

Indians in the Great Lakes region entered into several treaties with the United States. Several courts have examined the various Indian treaties in the Great Lakes region. *See*, *e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999)(1837 Treaty with the Chippewa, 7 Stat. 536; 1855 Treaty with the Chippewa, 10 Stat. 1165); *United States v. Brown*, 777 F.3d 1025, 1030 (8th Cir. 2015)(same); *Grand Traverse Band of Ottawa and Chippewa Indians v. Mich. Dep't. of Natural Resources*, 141 F.3d 635 (6th Cir. 1998)(1836 Treaty of Washington, 7 Stat. 491; 1855 Treaty of Detroit, 11 Stat. 621); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341 (7th Cir. 1983)(1837 Treaty with the Chippewa, 7 Stat. 536; 1842 Treaty with the Chippewa, 7 Stat. 591). The Red Cliff Band is a political successor in interest to the bands of the Lake Superior Chippewa who were parties to the 1837 Treaty with the Chippewa, 7 Stat. 537, and the 1842 Treaty with the Chippewa, 7 Stat. 591. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 707 F. Supp. 1034, 1036 (W.D. Wis. 1989). In this case, the parties agree that the most relevant treaty is the 1842 Treaty, in which the Lake Superior Chippewa ceded the western half of Michigan's Upper Peninsula and parts of Northern Wisconsin, as well as portions of Lake Superior, to the United States. 1842 Treaty with the Chippewa, 7 Stat. 591

When construing the 1842 Treaty, the Court must be mindful of the special rules of construction that apply to Indian treaties. The treaty must be interpreted "to give effect to the terms as the Indians themselves would have understood them." *Mille Lacs Band*, 526 U.S. at 196; *see also Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675-76 (1979). Because the United States had superior negotiating skills and the treaties were written in their own language, the treaties must "be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be

understood by the Indians." *Jones v. Meehan*, 175 U.S. 1, 11 (1899); *see also United States v. Shoshone Tribe*, 304 U.S. 111, 116 (1938). In addition, courts must construe the treaties liberally in favor of the tribe and resolve any ambiguities in their favor. *Mille Lacs Band*, 526 U.S. at 200 (citations omitted); *Grand Traverse Band of Ottawa and Chippewa Indians v. Mich. Dep't. of Natural Resources*, 141 F.3d 635, 639 (6th Cir. 1998).

"'[T]he starting point for any analysis of [rights granted by a treaty] is the treaty language itself.'" *Soaring Eagle Casino and Resort v. N.L.R.B.*, 791 F.3d 648, 657 (6th Cir. 2015) (quoting *Mille Lacs Band*, 526 U.S. at 196 (alterations in original)). Article 2 of the 1842 Treaty provides:

> The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress.

1842 Treaty with the Chippewa, Art. 2, 7 Stat. 591.

The Sixth Circuit has not had the opportunity to address the fishing rights in the 1842 Treaty. However, in *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 365 (7th Cir. 1983), the Seventh Circuit examined the 1842 Treaty and determined that the usufructuary rights—including the fishing rights—remain valid today. The court began by noting the importance of the usufructuary rights to the Chippewa bands, as they "subsisted mainly by hunting, fishing, trapping, harvesting wild rice, making maple sugar, and engaging in various gathering activities." *Id.* at 344. The court then discussed the history of treaty negotiations between the United States and the Chippewa Indians. *Id.* at 344-50. With respect to the 1842 Treaty, the court explained:

> In 1841, Congress appropriated $5,000 for the expenses of negotiating a treaty to extinguish Indian title to lands in Michigan, a portion of which was held by the Chippewa bands. In July 1842, Robert Stuart, Superintendent of the Michigan Indian Agency wrote to the Secretary of War. He stated that, subsequent to the 1841 appropriation, it had been learned that the mineral district Congress wished to acquire extended beyond northern Michigan into Wisconsin. He recommended purchase of the Wisconsin as well as the Michigan land, stating that "the main importance of immediately acquiring this territory, is owing to its supposed great mineral productivity." He noted that it would not be necessary to remove the Indians from the land until the land was required for white settlement. A month later, Stuart was appointed commissioner to negotiate the proposed treaty with the Chippewas. His instructions stressed the importance of gaining the mineral lands and acquiring control over the south shore of Lake Superior. He was told that general removal of the Indians from the territory would not occur for "considerable time."
>
> Stuart reported the outcome of his negotiations with the Chippewas in an annual report to the Bureau of Indian Affairs dated October 28, 1841. He noted the importance of the mineral deposits on the land and indicated that the concluded treaty had arranged a sharing of annuities between the Lake Superior tribes and the Mississippi tribes. This sharing was necessary to end a feud that had developed between the tribes after the 1837 treaty.
>
> . . .
>
> The December 5, 1842, report on the treaty by the Commissioner of Indian Affairs to the Secretary of War stressed the importance of acquiring the minerals and of commanding the south shore of Lake Superior. A report by the Superintendent of the Wisconsin Indians to the Commissioner of Indian Affairs the following year noted that exclusive possession of the Lake Superior shore would be commercially important, especially as settlements and mineral trade expanded.

*Id.* at 345.  In a series of opinions following the *Voight* decision, Wisconsin district courts further examined the scope of these usufructary rights.[2]  In one of those cases, *Lac Courte Oreilles Band*

---

[2] *See e.g.*, *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420 (W.D. Wis. 1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 668 F. Supp. 1233 (W.D. Wis. 1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 686 F. Supp. 226 (W.D. Wis. 1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 707 F. Supp. 1034 (W.D. Wis.

*of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420, 1428-29 (W.D. Wis. 1987), the district court made several factual findings regarding the history of the Chippewa Indians commercial activity. The court found that "[t]hroughout the nineteenth century, the Chippewa were participants in an international market economy" and they "were aware of the principles of the Euro-American market economy." *Id.* at 1428. The court also found that, "[t]he Chippewa developed an economic strategy that incorporated both their traditional economy and the market economy in such a way that they were able, on the one hand, to transact business with non-Indians who were participating in the Euro-American market economy and, on the other, to transact social and political relations with one another in the traditional manner." *Id.* at 1429.

After considering the historical context and the language of the 1842 Treaty, the undersigned finds that the charged conduct—falsely labeling fish—does not fall within the scope of the treaty rights in the 1842 Treaty. The 1842 Treaty expressly provides that "the laws of the United States shall be continued in force, in respect to their trade and inter course with the whites, until otherwise ordered by Congress." This language is unambiguous—federal laws still apply when trading with non-Indians. *See Keweenaw Bay Indian Community v. Rising*, 2005 WL 2207224, at *11 (W.D. Mich. 2005) (addressing the same provision and determining that "[t]he 1842 Treaty plainly makes federal law applicable to the Ceded Area, and federal law permits the states to impose their tobacco taxes on cigarettes sales to nonmembers of the Tribe.") *aff'd*, 477 F.3d 881, 883 (6th Cir. 2007). And, as discussed above, Chippewa Indians understood the basic principles of trading. Simply, no member of the Chippewa tribe would have understood the treaty rights from the 1842 Treaty to include a right to submit false accounts of fish that they intended to trade with non-Indians.

---

1989); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 740 F. Supp. 1400, 1421 (W.D. Wis. 1990).

Peterson concedes that his treaty rights are not unlimited when labeling fish intended to be sold in interstate commerce. He concedes that he could be federally prosecuted for selling a walleye that he falsely labeled as a trout in interstate commerce. (ECF No. 35, PageID.84.) But, Peterson argues that this false labeling is different because it "related only to the tribe's internal regulation of its treaty rights." (*Id.*) This argument is without merit. The following hypothetical illustrates the flaw in Peterson's argument. The Red Cliff Code provides that a "miscellaneous tag" must be affixed to all harvested walleyes. Red Cliff Code § 7.8.3. What if Peterson affixed a miscellaneous tag to a lake trout? Peterson's argument that he was only attempting to evade tribal regulations would also be applicable to this situation. However, this false labeling would involve the exact same conduct that Peterson concedes would be a federal offense. In addition, Peterson is not charged with violating the tribal code. He is charged with attaching a false label to a fish that he attempted to sell in interstate commerce. The reason for attaching the false label has no significance. The only Court of Appeals to consider whether the False Labeling provision of the Lacey Act contains a materiality requirement has determined that it does not. *United States v. Fountain*, 277 F.3d 714, 717 (5th Cir. 2001).

Finally, the Eighth Circuit's opinion in *United States v. Brown*, 777 F.3d 1025 (8th Cir. 2015), is distinguishable from this case. In that case, the Eighth Circuit held that the defendants' fishing rights under an 1837 treaty barred the federal prosecution because the tribe had an exclusive right to hunt and fish on lands reserved to them. First, *Brown* did not involve the false labeling provision of the Lacey Act. Instead, the defendants were indicted for violating the trafficking provision of the Lacey Act, which makes it unlawful to "sell . . . any fish . . . taken, possessed, transported, or sold in violation of . . . any Indian tribal law." 777 F.3d 1025, 1027 (citing 16 U.S.C. § 3372(a)(1)). In other words, the Government is required to prove a violation of

tribal law to be found guilty of the federal offense.  There is no such requirement in the false labeling offense.  Second, *Brown* involved conduct that occurred on the reservation. Although Peterson contended otherwise during the motion hearing, the Eighth Circuit expressly stated in its opinion that, "[t]he indictments alleged that [the defendants] had netted fish for commercial purposes within the boundaries of the Leech Lake Reservation in violation of the Leech Lake Conservation Code, then sold the fish." *Id.* Moreover, to the extent a trafficking offense is based on a violation of tribal law, the offense must have occurred in Indian country. See 16 U.S.C. § 3371(c). Here, the conduct Peterson is charged with occurred off the reservation. Third, *Brown* involved a different treaty. Unlike the 1842 treaty, the treaty in *Brown* did not expressly provide that "the laws of the United States shall be continued in force, in respect to their trade and inter course with the whites, until otherwise ordered by Congress."

It is undisputed that Peterson, as a member of the Red Cliff Band, has treaty rights to catch and sell lake trout from Lake Superior. His treaty rights, however, do not extend to attaching false labels to the fish he attempts to sell in interstate commerce. Therefore, the undersigned recommends that the Court deny Peterson's motion to dismiss.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within 14 days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3. Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:  March 9, 2018     /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE